UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                              :

UNITED STATES OF AMERICA

                                              :

          - v. -                                        12 Cr. 887 (ALC)

                                              :

BENJAMIN DURANT, et al.,

                                            :

          Defendants.

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF THE SUFFICIENCY OF THE DEFENDANTS' GUILTY PLEAS


                                            PREET BHARARA
                                            United States Attorney for the
                                            Southern District of New York
                                            Attorney for the United States
                                              of America.

Jessica Masella
Andrew Bauer
Damian Williams
Assistant United States Attorneys
       – Of Counsel –

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in support of the

sufficiency of the guilty pleas for four of the defendants in this case and in response to the

questions raised by the Court at the December 18, 2014 conferences in this matter related to the

Second Circuit's recent opinion in *United States* v. *Newman*, No. 13–1837–cr, 2014 WL

6911278 (2d Cir. Dec. 10, 2014) ("*Newman*").  The *Newman* decision dramatically (and, in our

view, wrongly) departs from thirty years of controlling Supreme Court authority and, in so

doing, legalizes manipulative and deceptive conduct that no court has ever sanctioned.[1]

This case, however, is not precluded by *Newman*.  *Newman*, an insider trading case

brought under the classical theory of liability, should not apply to this case, brought under the

misappropriation theory of liability.  The Second Circuit has long distinguished between the

classical and misappropriation theories, which arise from different kinds of breaches of fiduciary

duty and therefore require different showings to prove liability under the federal securities laws.

The *Newman* panel did not overrule that longstanding precedent governing the law of

misappropriation.  Accordingly, the Government submits that each defendant's guilty plea

remains sufficient and should not be vacated.

**STATEMENT OF FACTS**

This case charges five defendants for their participation in an insider trading scheme

related to the acquisition by International Business Machines ("IBM") of SPSS, Inc. ("SPSS"), a

smaller publicly traded software company (the "IBM/SPSS Transaction"), which was publicly

announced in July 2009.  Four of the five defendants, including Daryl Payton, Benjamin Durant,

David Weishaus, and Thomas Conradt, were working together as stock brokers in the Manhattan

---

[1]   The Government is considering whether to seek appellate review of the *Newman* decision and has obtained a 30-day extension of time, until January 23, 2015, to seek panel rehearing and rehearing *en banc* before the Second Circuit.

office of a Connecticut-based securities trading firm during June and July of 2009.  Trent Martin,

who was working as a research analyst for a financial services firm, was Conradt's roommate

and friend in June and July 2009.  Martin obtained the information relating to the IBM/SPSS

Transaction in May and June 2009 from his friend ("Attorney-1"), who was working as an

attorney on the acquisition at a large New York-based law firm.

As a result of his work at the law firm, Attorney-1 was privy to material nonpublic

information related to the IBM/SPSS Transaction (the "Inside Information").  During the course

of his work on the IBM/SPSS Transaction, Attorney-1 learned, among other things, the names of

the parties involved, the nature of the transaction, and the share price at which IBM proposed to

purchase SPSS.  Beginning on May 31, 2009 and continuing through July 2009, Attorney-1

shared confidential Inside Information with Martin, including the fact that IBM had offered to

buy SPSS and that the offering price would be at a significant premium to the current market

price for SPSS.

Thereafter, Martin told Conradt about the IBM/SPSS Transaction, and Conradt passed

the information to Weishaus, Durant, Payton, and another co-conspirator ("CC-1"), who also

worked at the same trading firm.  All five defendants purchased SPSS common stock and/or

SPSS call option contracts[2] with expiration dates in August and September 2009.  On many days

during July 2009, the defendants' and their co-conspirators' trading accounted for the majority of

the total options trading in SPSS securities in the market.  In early July, Durant, in particular,

liquidated $50,000 from his retirement savings account (incurring an early distribution tax

---

[2]    A call option contract gives the holder an option to purchase common stock at a price
specified in the contract, at any time up to the expiration date of the option.  In this case, the
defendants and their co-conspirators purchased call options at prices higher than the current
stock price of SPSS, with expiration dates after the anticipated acquisition by IBM, which had
value only if the price of SPSS stock increased before the expiration date of the call option
contracts.

penalty), which he used to purchase SPSS call options in early July 2009.  Consequently, by July 28, 2009, Durant held over 600 call option contracts, which had expiration dates in August and September 2009.  On July 28, 2009, IBM and SPSS publicly announced the IBM/SPSS Transaction.  On the day of the public announcement, SPSS's share price increased more than 40% over the prior day's closing price.

Several hours after the announcement, Durant, Conradt, and CC-1 went to lunch together at a restaurant near their office.  During that lunch, CC-1 discussed, among other things, the fact that he had sought legal advice in connection with his trading in SPSS.  Durant paid for everyone's lunch, but stated that he would pay in cash, so as not to generate a record of their lunch meeting.  Later that night, Durant, Payton, Conradt, Weishaus, and CC-1 met at a hotel in Manhattan to discuss their insider trading and come up with a cover-up story.  During that meeting, the defendants and the others discussed their trading in SPSS securities and how much money they had made trading in advance of the announcement of the IBM/SPSS Transaction.  They further agreed that, if anyone asked about their trading, they should simply say that they liked technology stocks.

A few days after the announcement of the IBM/SPSS Transaction and before selling his SPSS call options, Payton transferred his SPSS call options from his account at the securities trading firm where he worked to two different accounts that he had just opened at another brokerage firm called Interactive Brokers.  In the course of opening his account at Interactive Brokers, via a telephone call that was recorded, Payton lied about his employment, stating that he was a "self-employed real estate consultant" rather than a stock broker.  During the same call, a representative from Interactive Brokers told Payton that if he worked at a broker dealer, duplicate account statements might have to be sent to his employer.

In November 2009, in connection with an internal investigation by their employer into the trading of SPSS securities by Durant, Payton, Weishaus, and CC-1, the defendants completed written questionnaires about their trading in SPSS securities.  They all lied about their trading; none admitted that they had traded based on Inside Information in connection with their purchases of SPSS securities.

In total, the defendants' scheme reaped profits in excess of $1 million.  Durant, Payton, Weishaus and CC-1 profited predominantly from their trading in SPSS call options.  In particular, as a result of their trading in SPSS call options based on Inside Information, in a matter of weeks, Durant profited over $625,000 (on an approximately $33,000 investment); Payton profited over $250,000 (on an approximately $11,000 investment); Weishaus profited over $120,000 (on an approximately $18,000 investment); and CC-1 profited over $44,000 (on an approximately $2,500 investment).  Martin and Conradt, who traded primarily in SPSS common stock, profited over $9,000 and $2,500, respectively.

Based on this conduct, four defendants (Daryl Payton, Thomas Conradt, David Weishaus and Trent Martin) pleaded guilty to conspiracy and/or substantive insider trading charges related to the insider trading scheme.  One defendant (Benjamin Durant) has pleaded not guilty and is scheduled to begin trial on February 23, 2015 with respect to those charges.[3]  Each of the four defendants who pleaded guilty admitted that he traded in SPSS securities on the basis of Inside Information (which he understood to be material nonpublic information) that he had received, that he understood that the Inside Information had been obtained in breach of a duty, and that he did so knowingly.  The defendants also admitted in their guilty plea allocutions that at the time they committed the insider trading they knew what they were doing was wrong or illegal.  For

---

[3]  On January 5, 2015, Durant renewed his motion to dismiss the charges against him on the basis of the *Newman* decision.  The Government will respond to that motion on January 19, 2015.

the reasons that follow, the defendants' guilty pleas are valid under Federal Rule of Criminal

Procedure 11 and no further allocution is necessary.

## ARGUMENT

The defendants' guilty pleas in this case remain sufficient, notwithstanding the Second

Circuit's recent *Newman* decision.  As discussed in more detail below: (i) the Supreme Court and

the Second Circuit have long distinguished between the different breaches of duty implicated by

the classical and misappropriation theories of insider trading liability; (ii) neither the Supreme

Court nor the Second Circuit's precedents require proof of a personal benefit to the tipper, or

knowledge of such a benefit by the tippee, to find Section 10(b) liability in misappropriation

cases; (iii) *Newman*'s holdings do nothing to alter the requisite elements of misappropriation

liability under Section 10(b); (iv) to the extent that *Newman* notes commonality between the

elements of tipping liability in both classical and misappropriation cases, that language did not

alter longstanding Circuit precedent; and (v) *Newman* ultimately must be read consistently with

other Second Circuit precedent, which makes clear that there is no personal benefit requirement

in a misappropriation case.

### A.     The Classical and Misappropriation Theories of Insider Trading

There are two theories of insider trading: (1) the classical theory; and (2) the

misappropriation theory.  These two theories are different ways in which an individual can

violate Section 10(b) and Rule 10b-5 by engaging in acts that "operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security."  17 C.F.R. 240.10b-5(c).

The difference between the two is in the nature of the fraud or deception at issue.

### 1.    *The Classical Theory of Insider Trading*

The fraud or deception in a classical theory case is the breach by an insider of a fiduciary

duty owed to shareholders, namely the duty not to take advantage of "information intended to be

available only for a corporate purpose and not for the personal benefit of anyone." *Dirks* v. *SEC*,

463 U.S. 646, 654 (1983) (quoting *In re Merrill Lynch, Pierce, Fenner & Smith, Inc*, 43 S.E.C.

933, 936 (1968)).  This duty arises because there is "'a relationship of trust and confidence'"

between an insider and shareholders that "gives rise to a duty to disclose [or to abstain] because

of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . .

uninformed . . . stockholders.'"  *United States* v. *O'Hagan*, 521 U.S. 642, 652 (1997) (quoting

*Chiarella* v. *United States*, 445 U.S. 222, 228-29 (1980)).  As such, the Supreme Court has held

that, in order for an insider to have improperly disclosed inside information, he must do so in

breach of a duty of trust and confidence to shareholders and for personal benefit.  *See Dirks*, 463

U.S. at 662.

This personal benefit requirement has long been a feature of classical cases.  As the

Supreme Court explained in *Dirks*, the "benefit" motive requirement reflects the federal

securities laws' particular concern with breaches of fiduciary duties to shareholders that "take

advantage of information intended to be available only for a corporate purpose and not for the

personal benefit of anyone."  463 U.S. at 654 (quotation marks and citation omitted).  Whether a

given disclosure will trigger federal insider trading liability (for the insider or a tippee in a

classical case) accordingly "depends in large part on the *purpose* of the disclosure."  *Id.* at 664

(emphasis added).  Some disclosures may be entirely proper, such as disclosures made for

business reasons to, for example, a consultant.  Others may violate a state-law duty of

confidentiality but not trigger the federal securities laws, such as a disclosure where the insider

"mistakenly [thought] the information already ha[d] been disclosed or . . . [was] not material."
*Id.* at 662.  What will trigger federal insider trading liability in a classical case involving an insider, is a breach of confidentiality motivated by a personal, rather than a corporate, purpose. *See id.*; *United States* v. *Whitman*, 904 F. Supp. 2d 363, 371 (S.D.N.Y. 2012) (stating that benefit requirement is meant to identify self-dealing).

Recognizing that proof of a motive of personal gain would be difficult to develop in a given case, the *Dirks* Court explained that "objective criteria"—including a personal benefit actually conferred—could establish the requisite motive.  *Dirks*, 463 U.S. at 662.  Thus, the question whether an insider has benefited is part of the duty analysis in a classical case, not because a benefit is *per se* required, but because it *evidences* the improper motive necessary to give rise to liability for insider trading in this context.  *See id.*

### 2.     *The Misappropriation Theory of Insider Trading*

Under the misappropriation theory, in contrast, the requisite fraud or deception is located in the breach of a duty owed to a different principal—a source of confidential information, most frequently an employer, but sometimes other individuals or entities to which a duty of trust and confidence is owed.  *See O'Hagan*, 521 U.S. at 652.  In *O'Hagan*, the Supreme Court helped identify the bounds of the duty in a misappropriation case by, for example, referring to Section 395 of the *Restatement (Second) of Agency*, which provides in relevant part that a fiduciary breaches the duty not to misappropriate a principal's confidential information whenever the fiduciary discloses that information "in competition with or to the injury of the principal . . . ." 521 U.S. at 654-55.  The comments to that Restatement section further explain that the fiduciary "has a duty not to use the information acquired by [the fiduciary] as agent . . . for *any purpose* likely to cause [the] principal harm or to interfere with [the principal's] business . . . ."

*Restatement (Second) of Agency* § 395 comment a (emphasis added).  This is a duty centered on agency relationships and property rights in information, not self-dealing (as is true for classical cases).  *See United States* v. *Libera*, 989 F.2d 596, 600 (2d Cir. 1993) (explaining that the point of the misappropriation theory "is to protect property rights in information").  Indeed, the Restatement's reference to use of the information for "any purpose" indicates that the purpose need not include a personal benefit; rather, the emphasis is on harm to the principal stemming from the theft of the information.  *See also Restatement (Third) of Agency* § 8.05 ("An agent has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.").

As the Supreme Court articulated in *O'Hagan*, the source's "confidential information . . . qualifies as property to which the [source] has a right of *exclusive* use."  521 U.S. at 654 (emphasis added).  Thus, any unauthorized use of the source's information diminishes that exclusivity whether or not the agent is motivated by personal gain.[4]  Misappropriation is, in *O'Hagan*'s terms, an action "akin to embezzlement."  *Id.*; *see also id.* at 682 n.1 (Thomas, J., concurring in part and dissenting in part) (noting that "the 'use' to which one puts misappropriated property need not be one designed to bring profit to the misappropriator: Any 'fraudulent appropriation to one's own use' constitutes embezzlement, regardless of what the embezzler chooses to do with the money").

The difference between classical and misappropriation cases stems from the distinct duties underlying the two theories.  Nothing about a breach of the duty at issue in misappropriation cases requires the demonstration of a personal benefit to the tipper, as is true in

---

[4]    The misappropriator, of course, must misuse the information in connection with the purchase or sale of securities to give rise to liability under the federal securities laws based on the misappropriation.

classical cases.  That is because a breach in a misappropriation case occurs upon the theft of

confidential information, whereas the breach in a classical case occurs where there is a disclosure

for a personal (rather than corporate) purpose. As noted above, the breach in a classical case is

centered not on the use of inside information, but only on the use of inside information for the

purpose of self-dealing—hence the personal benefit motive requirement.

Put another way, a benefit is required in classical cases in part to differentiate between an

insider's proper versus improper use of confidential information.  Some disclosures of

confidential information by insiders—*e.g.*, an authorized disclosure of information to a

consultant, a banker, or, as in *Dirks*, an insider's legitimate disclosure to expose a fraud—are

proper and consistent with a relationship of trust of confidence.  The principal is only injured,

and the securities laws violated, when information is used in a way that reflects self-dealing.  *See*

*Whitman*, 904 F. Supp. 2d at 371 ("The element of self-dealing, in the form of a personal benefit

… must be present.").  No similar requirement exists in a misappropriation case where the

misappropriator of the information is not an insider.  There, the principal is injured, and the agent

acts disloyally, *whenever* information is misappropriated, as the principal has a property-like

interest in the information and its confidentiality.  *See Libera*, 989 F.2d at 600; *SEC* v. *Materia*,

745 F.2d 197, 202 (2d Cir. 1984) ("We find similarly unavailing Materia's argument that

Browne was not injured as a result of his misappropriation of client information.  Among a

financial printer's most valuable assets is its reputation as a safe repository for client secrets….

[I]t cannot be gainsaid that Materia undermined his employer's integrity.").

>    3.    *The Second Circuit's Misappropriation Precedents Do Not Require a Benefit*

Consistent with the foregoing discussion, the Second Circuit explained long ago in

*Libera* that "the misappropriation theory requires the establishment of two elements: (i) a breach

9

by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the tippee's

knowledge that the tipper had breached the duty.  We believe that these two elements, *without*

*more*, are sufficient for tippee liability."  989 F.2d 596, 600 (1993) (emphasis added).   Similarly,

in *United States* v. *Falcone*, 257 F.3d 226 (2d Cir. 2001), the Circuit again explained that "to

support a conviction of the tippee defendant, the government was simply required to prove a

breach by, [] the tipper, of a duty owed to the owner of the misappropriated information, and the

defendant's knowledge that the tipper had breached the duty."  *Id.* at 234.  Like *Libera* before it,

*Falcone* followed a property-rights approach to misappropriation cases.  *Cf. SEC* v. *Sargent*, 229

F.3d 68, 77 (1st Cir. 2000) (noting that, in *Libera*, the "Second Circuit strongly implied . . . in

dicta[] that there was no need to make an affirmative showing of benefit in cases of

misappropriation").

District courts in the Second Circuit have concluded that there is no personal benefit

requirement in misappropriation cases.  For instance, Judge Wood in *SEC* v. *Musella* held that

"[t]he misappropriation theory of liability does not require a showing of a benefit to the tipper."

748 F. Supp. 1028, 1038 n.4 (S.D.N.Y. 1989).  The court in *SEC* v. *Willis*, another

misappropriation case, echoed *Musella* and also found that "the misappropriation theory does not

require a showing of a benefit to the tipper."  777 F. Supp. 1165, 1172 (S.D.N.Y. 1991) (Connor,

J.); *see also SEC* v. *Lyon*, 605 F. Supp. 2d 531, 548 (S.D.N.Y. 2009) (Judge Stein rejecting

argument that misappropriation liability requires the receipt of personal benefit and noting that

"the Second Circuit has declined to impose a 'benefit' requirement in misappropriation theory

cases….'").

The Second Circuit's decision in *SEC* v. *Obus*, 693 F.3d 276 (2d Cir. 2012), is not to the

contrary.  In *Obus*, the Second Circuit noted that the tipper in *Dirks*, a classical case, needed to

10

have personally benefitted in order to incur liability under Section 10(b). *Id*. at 285 (citing *Dirks*, 463 U.S. at 660-664).  It then concluded that while the "Supreme Court's tipping liability doctrine was developed in a classical case, *Dirks*, [] the same analysis governs in a misappropriation case." *Id*. at 285-86.  However, in so doing, the *Obus* court cited *Falcone*, which, as discussed above, does not require a benefit to the tipper for liability in a misappropriation case. *See id.* at 285-86 (citing *Falcone*, 257 F.3d at 233).  To the extent that *Obus* speaks of a "benefit" to a tipper who is charged with violating Section 10(b) in a misappropriation case, *Obus* suggests that the benefit to which it refers is inherent in the circumstance when inside information is misappropriated. *Id*. at 286-87 ("Because the act of misappropriation itself is deceitful, *O'Hagan*, 521 U.S. at 653, evidence that the tipper knowingly misappropriated confidential information will support an inference that the misappropriator had a 'mental state embracing intent to deceive, manipulate, or defraud.'").

Indeed, in *United States* v. *Whitman*, a post-*Obus* opinion, Judge Rakoff surveyed the history and development of insider trading law and noted that while personal benefit (and a tippee's knowledge of that benefit) is required in classical cases, no such requirement can be located in misappropriation cases.  904 F. Supp. 2d at 370-71 (citing, among other cases, *Libera* and *Falcone*).  That is because, as Judge Rakoff explained, the Second Circuit's misappropriation decisions were grounded in the protection of property rights. *See id.* at 370 (citing *Libera*, 989 F.2d at 600).  That conceptual foundation, Judge Rakoff observed, means that "the tippee's knowledge that disclosure of the inside information was unauthorized is sufficient for liability in a misappropriation case." *Id*.

*Obus* also makes plain that a downstream tippee need not know of any benefit to the tipper in order to have knowledge of the tipper's breach, which is consistent with longstanding circuit precedent.  As *Obus* explained, tippee liability is established if a tippee "knew . . . that confidential information was initially obtained and transmitted improperly (and thus through deception), and if the tippee intentionally . . . traded while in knowing possession of that information."  *Id.* at 288.  Critically, *Obus* did not require the SEC to prove that the successive tippee knew that anyone else in the tipping chain personally benefitted from the inside information.  Instead, a successive tippee who trades on confidential information simply must know that the information was obtained and conveyed *improperly*, but need not know more particulars about the breach.

**B.**     ***Newman* Did Not Change the Law of Misappropriation**

        *1.*     Newman's *Holdings*

*Newman* is a classical insider trading case.  There, the original tippers in the chain were insiders.  The defendants—Todd Newman and Anthony Chiasson—were hedge fund portfolio managers who traded securities with the assistance of a select number of analysts who belonged to a small group of friends, mostly hedge fund analysts, who conspired to obtain material non-public information so that they and their bosses could benefit by trading on it.  The circle had particular success in developing sources within public companies—insiders—who had access to periodic earnings numbers during the time between the close of the quarter and the release of the earnings to the public.  At trial, the evidence proved that Newman and Chiasson obtained inside information concerning earnings at two public companies—Dell, Inc. and NVIDIA Corporation—that netted Newman and Chiasson $4 million and $68 million in profits, respectively, for their hedge funds.  Both defendants were convicted at trial of violating Section

10(b).  On appeal, the primary question presented to the Second Circuit was whether the trial

court properly instructed the jury that, in order to be held criminally liable, both defendants had

to know that the insider-tippers' breaches were in exchange for a personal benefit.

The *Newman* panel first held that in order for a tippee of inside information to be guilty

of insider trading, the insider who breached his duty must have done so in exchange either for

pecuniary gain or as part of a "meaningfully close personal relationship that generates an

exchange that is objective, consequential, and represents at least a potential gain of a pecuniary

or similarly valuable nature."  *Newman*, 2014 WL 6911278, at \*10.  The *Newman* panel then

concluded that a tippee must know of the tipper's personal benefit.  The panel then found

insufficient the Government's evidence that Newman and Chiasson had the requisite knowledge

that they were trading on inside information or that the information was obtained in exchange for

a personal benefit.  *Newman*, 2014 WL 6911278, at \*11.  The panel ultimately vacated the

convictions and dismissed the indictment with prejudice on both the benefit and the knowledge-

of-the-benefit standards.[5]

2.      Newman *Does Not Alter the Elements of Misappropriation Liability*

Before pronouncing its holdings, *Newman* mentioned and, in passing, explained the

"alternative, but overlapping, theory of insider trading liability, commonly called the

'misappropriation' theory."  *Newman*, 2014 WL 6911278, at \*4.  In the context of articulating

the concept of liability for downstream tippees, and following its explanation of the

misappropriation theory of liability, the opinion remarked, without discussion, that "[t]he

elements of tipping liability are the same, regardless of whether the tipper's duty arises under the

'classical' or the 'misappropriation' theory."  *Newman*, 2014 WL 6911278, \*4 (citing *Obus*, 693

---

[5]      To be sure, the Government views both holdings as unprecedented and erroneous.
However, neither holding is implicated in a misappropriation case.

F.3d at 285-86).  This observation is simply a restatement of the well-settled law that in both cases, in order to establish a Section 10(b) violation, the Government must prove (1) a breach, (2) followed by the misuse of information in connection with the purchase or sale of securities. But, as precedents from *Dirks* to *O'Hagan* make clear, the operative "breach" is different under the two theories of liability.  *See, e.g.*, *Lyon*, 605 F. Supp. 2d at 548-49 (relying on *O'Hagan* to hold that a "breach" in misappropriation cases requires no showing of personal benefit).

It would be incorrect to read more into this one sentence than it can logically bear. Beyond merely restating clearly established law, it is also surely *dicta* inasmuch as it has no bearing on, and no connection with, *Newman*'s twin holdings concerning the benefit standard, and the requisite knowledge of the benefit by a tippee, in the classical context.  It is significant that on appeal, neither Newman nor Chiasson asked the Second Circuit to disturb the misappropriation line of cases.  Indeed, in his brief to the Second Circuit, Newman *conceded* that "historically, the Second Circuit has not required a personal benefit in insider trading cases, like *Obus*, that are prosecuted under the misappropriation theory."  Newman Br. at 38 n.20 (citing, among other cases, *Libera*).  Chiasson, for his part, stated: "In 'classical theory' cases such as this one, it has been clear since *Dirks* that the tipper must anticipate a personal gain and the tippee must know this in order for liability to attach.  This Court need not decide here whether the same requirements exist in 'misappropriation' cases."  Chiasson Br. at 39 n.13.  Accordingly, any fundamental reworking of misappropriation liability would have been not only *dicta* but also entirely *sua sponte*.

Finally, to read *Newman* as importing a benefit element into misappropriation cases would be inconsistent with the Second Circuit's prior precedents, such as *Libera* and *Falcone*. As explained above, both *Libera* and *Falcone* clearly articulated the elements required for tippee

14

liability in misappropriation cases.  *Libera*, 989 F.2d at 600, *Falcone*, 257 F.3d at 234.  Neither

case required personal benefit for a "breach."  Tracing these pre-*Newman* misappropriation cases

is critical to understanding why, in addition to reasons set forth above, *Newman* has no impact on

misappropriation liability.  In particular, these Second Circuit precedents must inform the

Court's interpretation of the statement in *Newman* that "[t]he elements of tipping liability are the

same, regardless of whether the tipper's duty arises under the 'classical' or the

'misappropriation' theory."  *Newman*, 2014 WL 6911278, *4 (citing *Obus*, 693 F.3d at 285-86).

That single statement did not (and, coming from a panel decision, could not) disturb decades

worth of misappropriation precedent in the Circuit.  *See, e.g.*, *Piesco* v. *Koch*, 12 F.3d 332, 345

(2d Cir. 1993) ("[A] panel of the [Second Circuit] lacks the authority to overrule the prevailing

law of the circuit.").[6]

Accordingly, it is incorrect to assume that the *Newman* panel abandoned the Circuit's

prior cases like *Libera* and *Falcone*, and sweepingly redefined liability in misappropriation

cases—all in a single sentence of *dicta*.  Put simply, although *Newman* wrongly narrows liability

in classical insider trading cases, it inflicts no similar harm to longstanding misappropriation

principles of liability.

---

[6]   The Eleventh Circuit is the only appellate court that has explicitly held that
misappropriation cases, like classical cases, require a showing of personal benefit.  *See SEC* v.
*Yun*, 327 F.3d 1263 (2003) ("After considering the policies underpinning the insider trading
rules, we are led to the conclusion that the SEC must prove that a misappropriator expected to
benefit from the tip.").  However, in so doing, the *Yun* court expressly disagreed with the Second
Circuit's longstanding approach to misappropriation cases, specifically its formulation in *Libera*.
*See id.* at 1277 n.31 (concluding that "Judge Winter's statement in *Libera*  . . . that the
misappropriation theory's purpose 'is to protect property rights in information' – is . . .
incomplete in that it ignores the fact that the theory's essential purpose must be the prevention of
fraud").  *Yun*'s aim to "synthesize, rather than polarize, insider trading law," *id.* at 1276, is
flawed.  As discussed above, the classical and misappropriation theories involve breaches of
different duties owed to different, and not comparable, principals.  They are, in effect, different
forms of fraud, and there is no obvious imperative, as the Eleventh Circuit suggested, to
harmonize the two theories simply for simplicity's sake, especially if so doing would narrow a
theory of liability meant to be a broad prohibition against fraud.

## CONCLUSION

Defendants Trent Martin, Thomas Conradt, David Weishaus, and Daryl Payton each allocuted to sufficient facts under well-settled principles of misappropriation law.  For the reasons set forth above, their guilty pleas remain legally sufficient, and *Newman* does not require a contrary finding.

Dated: January 12, 2015
       New York, New York


                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney


                     By:  __/s/_____
                          Jessica Masella
                          Andrew Bauer
                          Damian Williams
                          Assistant United States Attorneys
                          Tel. No.: (212) 637-2288/2354/2298